**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MARY M. BLYLER ) | CASE NO. 1:09-cv-0327 |
|    Plaintiff, ) | |
| ) | |
| v ) | JUDGE ECONOMUS |
| ) | |
| MICHAEL J. ASTRUE, ) | MAGISTRATE JUDGE VECCHIARELLI |
| Commissioner of Social Security ) | |
| ) | |
|    Defendant. ) | **REPORT & RECOMMENDATION** |
| ) | |

Plaintiff, Mary M. Blyler ("Blyler"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Blyler's applications for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416 (i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge for a report and recommendation pursuant to a referral under Local Rule 72.2(b).

For the reasons set forth below, the final decision of the Commissioner should be AFFIRMED.

**I. Procedural History**

Blyler filed her applications for SSI and DIB on February 28, 2005 alleging disability as of March 15, 2003. Her applications were denied initially and upon

reconsideration. Blyler timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Peter Beekman, held a hearing on April 21, 2008, at which Blyler, who was represented by counsel, Dr. Nancy Borgeson, vocational expert ("VE"), and Dr. Gottfried Spring, medical expert ("ME") testified. The ALJ issued a decision on May 16, 2008 in which he determined that Blyler was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Blyler filed an appeal to this Court.

On appeal, Blyler claims that: (1) the ALJ erred by rejecting the ME's testimony that Blyler's impairments equaled a listing because the impact of her substance abuse is indivisible from the impact of her other mental impairments; (2) the ALJ's finding that Blyler is not disabled is not supported by substantial evidence because the hypothetical question relied on by the ALJ did not include all of Blyler's limitations. The Commissioner disputes Blyler's claims.

## II. Evidence

### A. Personal and Vocational Evidence

Blyler was born on June 18, 1955. Transcript ("Tr.") 68 and was 52 years old at the time of the hearing. She attended school for 11 years. (Tr. 261). Blyler has past relevant work experience as a factory worker, deli clerk, cashier/stock person, and retail manager. (Tr. 83-84).

### B. Medical Evidence

On April 6, 2001, Blyler was committed to Forum Health Psychiatric Hospital based on her husband's affidavit. (Tr. 364). Blyler, who had a history of alcohol abuse, had made suicidal threats and had threatened to harm someone whom she thought

2

stole her dog. After being admitted, Blyler was diagnosed with depressive disorder, NOS and alcohol dependence; she was assigned a GAF score of 25[1]. (Tr. 368). Blyler's treatment plan included monitoring her alcohol withdrawal and restarting her antidepressants. (Tr. 369).

Blyler was discharged on April 14, 2001. (Tr. 364). Her diagnoses at the time of her discharge included: (1) major depressive disorder, recurrent, severe without psychotic features; (2) alcohol dependence; and (3)substance abuse-severe. At the time of her discharge, she was assigned a GAF score of 80.[2] (Tr. 364). Steven A. King, M.D. noted on Blyler's discharge summary that Blyler had chronic polysubstance abuse problems; however, her level of function had improved. (Tr. 365).

Blyler presented to St. Elizabeth Medical Center ("St. Elizabeth") on January 30, 2002 for hypertension. Blyler stated that she had stopped taking her Prozac, and she was not sleeping or eating well. She reported increased anxiety. (Tr. 169). On February 1, 2002, Blyler's husband reported to the St. Elizabeth social worker that Blyler drinks daily and leaves home for days. She is physically abusive toward him and destructive toward household items. Blyler's husband reported that he attends Al-Anon.

---

[1] A GAF score between 21-30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

[2] A GAF score between 71-80 indicates no more than slight impairment in social, occupational, or school functioning . If symptoms are present, they are transient and an expectable reactions to psychosocial stressors. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

(Tr. 168).

Blyler presented to St. Elizabeth on May 9, 2002 (Tr. 166), June 13, 2002 (Tr. 165), and December 12, 2002 (Tr. 164) for follow up for hypertension and to have her prescriptions renewed.

In March 2004, Blyler was incarcerated for domestic violence against her estranged husband. (Tr. 170, 189). On May 7, 2004, Department of Corrections psychiatrist Dr. Gemma completed a mental health examination of Blyler. Blyler reported a history of anxiety problems but denied a history of substance abuse. Dr. Gemma noted that Blyler had previously taken Prozac, Trazadone, Buspar, and Clonidine. (Tr. 187). Dr. Gemma noted that Blyler had adequate grooming and no motor abnormalities. Her mood was euthymic and she presented with frequent smiling and laughter. She had no abnormalities concerning her speech or language, thought process, thought content and perception, or cognitive assessment. She denied suicidal ideation or attempts, and she had adequate insight and judgment. Dr. Gemma noted that Blyler had been off her medication for two weeks, and she appeared absolutely normal and without objective evidence of anxiety or depression. (Tr. 189-190).

On April 4, 2005, Mitchell Wax, Ph. D. performed a consultive examination. Dr. Wax noted that Blyler reported being in ten treatment centers for drinking. She reported drinking at least two 40 ounce bottles of beer daily. She stated that she lives with her boyfriend who does all the household chores. She has contact with her sister about once a week and contact with her son once a month. She does not have any friends and spends her day watching television. (Tr. 214-219).

Dr. Wax reported that Blyler was difficult to interview because she was vague and

4

circumstantial and often would not, or could not, provide information. Dr. Wax suspected that Blyler was malingering. Dr. Wax opined that Blyler's ability to relate with others is moderately impaired due to her depression and alcoholism. Blyler's mental ability to understand, remember, and follow instructions is not known. Her cognitive functioning could not be assessed due to her malingering. Blyler's mental capability to maintain attention, concentration, and persistence is markedly impaired, perhaps due to her alcoholism. Blyler's ability to withstand the stresses and pressures associated with day to day work activity is markedly impaired. She does not have a good ability to perform simple repetitive tasks on a consistent basis. Dr. Wax diagnosed Blyler with alcohol dependence, malingering, personality disorder, and depression. He could not assess her global functioning due to her malingering. (Tr. 218-219).

On April 14, 2005, Todd Finnerty, medical consultant completed a Psychiatric Review Technique. (Tr. 220). Finnerty opined that Blyler was: (1) mildly limited in her activities of daily living; (2) moderately limited in her ability to maintain social functioning; (3) moderately limited in her ability to maintain concentration persistence, and pace: and (4) had experienced one or two episodes of decompensation, each of an extended duration. (Tr. 230).

Also on April 14, 2005, Finnerty completed a Mental Residual Functional Capacity Assessment. Finnerty opined that Blyler was moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and

5

length of rest periods; (5) interact appropriately with the general public; (5) accept instruction and respond appropriately to criticism from supervisors; (6) respond appropriately to changes in the work setting; and (7) set realistic goals or make plans independently of others.  (Tr. 234-235).  State agency psychologist Catherine Flynn, Psy. D. reviewed Finnerty's assessment and noted her agreement with it.  (Tr. 236).

On April 19, 2005, Blyler presented to Michele A. Bender, MSN, APRN, BC at MetroHealth System ("MetroHealth") for a diagnostic assessment.  Blyler reported that she had been in and out of rehabilitation many times.  She stated that she does not intend to stop drinking and, "she does not believe alcohol hurts you any more than drinking Pepsi every day."  (Tr. 314).  Blyler reported visual and auditory hallucinations of her dead brother.  Bender noted that Blyler was disheveled, underweight, and smelled of alcohol.  She was disoriented as to time and place.  Her speech was slurred; her thoughts were disorganized; and she complained of racing thoughts.  Bender diagnosed Blyler with: (1) alcohol induced psychotic disorder with hallucinations versus major depression versus rule out metastasis producing hallucinations; (2) alcohol dependence, continuous; (3) nicotine abuse; and (4) antisocial personality disorder.  Bender assigned Blyler a GAF score of 31.[3]  (Tr. 316-317).

On June 9, 2005, Blyler presented to Bender for pharmacologic management.  Bender noted that Blyler was well groomed but still smelled of alcohol.  She was

---

[3] A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

oriented, and her speech was spontaneous with normal rate and flow. She reported auditory and visual hallucinations. (Tr. 303). Bender discussed the limited benefit of treatment if Blyler continues to drink. Bender diagnosed Blyler with substance induced mood disorder; alcohol withdrawal hallucinosis, and cluster B traits.

On September 25, 2006, Blyler presented to Bender for pharmacologic management. (Tr. 283). Blyler reported that she drinks a couple of beers a day. Bender noted that Blyler was well groomed but smelled of alcohol. She was oriented; and her speech was normal. She still reported auditory and visual hallucinations. Bender again explained to Blyler the limited benefits of treatment if she continued to drink. Bender diagnosed Blyler with substance induced mood disorder; alcoholic hallucinosis, and cluster B traits. (Tr. 283). On October 16, 2006, Bender renewed Blyler's September 25, 2006 diagnosis and again advised Blyler that the benefits of treatment were limited unless she stopped drinking. (Tr. 274-275).

### C. Hearing Testimony

Blyler testified that she smokes marijuana and probably last used it the week before the hearing. (Tr. 454). She testified that she drank a 40 ounce beer the day before the hearing and the day before that. (Tr. 455). She has been incarcerated for domestic violence. (Tr. 456). She has been hospitalized many times for mental problems, but she could not remember how many times. (Tr. 456). Blyler testified that she was taking many medications including medications to help her sleep, to reduce her anxiety, and to treat her hallucinations. (Tr. 456-458).

Blyler lives with her boyfriend who does, "everything for me" including grocery shopping and, "stuff around the house". (Tr. 457-458). Blyler's average day consists of

7

watching television and sleeping. (Tr. 458). Blyler talks to her adult son about every other day, and he visits from Indiana about once a month. (Tr. 458).

Blyler testified that her main problem with going to work is that she does not feel comfortable around people. She does not get along with people, and they get on her nerves. (Tr. 460). She is afraid that she is a menace, and that if she goes out she will, "get into it with somebody." (Tr. 461). Blyler testified that sometimes she thinks of hurting herself, but she cannot find a psychiatrist who will, "put up with" her. (Tr. 461).

Blyler testified that she has difficulty controlling her bladder. She has to wear a diaper, which she needs to change frequently. (Tr. 460).

Blyler testified that she continued to drink, against medical advice, because, "[i]t's the only thing that calms me down. I just forget things and it just takes my worries away." (Tr. 461).

Dr. Gottfried Spring, a medical expert, testified that Blyler has major depressive disorder and chronic substance abuse, primarily alcohol and cannabis. (Tr. 462). Her major depression has been diagnosed as substance induced mood disorder. (Tr. 462). Dr. Spring testified that Blyler's impairments met listings 12.04, 12.08, and 12.09 in combination. (Tr. 462-463). Dr. Spring testified that there was no way to tell whether Blyler's conditions would improve if she abstained from alcohol or substance abuse because she had not had a definable drug free or substance free period. Dr. Spring opined that perhaps her period of incarceration constituted a definable substance free period, but then concluded that it did not. Dr. Spring testified that Blyler's substance abuse problems were intertwined with her mental impairments and could not be separated. (Tr. 463-464).

8

Dr. Nancy Borgeson, VE, testified that Blyler had past work as a factory worker, deli clerk, cashier, and stock person.  (Tr. 464-465).  The ALJ asked the VE to consider an individual with Blyler's past relevant work who: (1) could lift/carry 50 pounds occasionally and 25 pounds frequently; (2) could stand, walk, or sit six out of eight hours a day; (3) has no limits on push/pull or foot pedal use; (4) could frequently do all postural and manipulative requirements; (5) has no visual or communicative limitations; (6) should avoid smoke fumes, dangerous machinery, and unprotected heights; (7) does not have the ability to relate to peers, supervisors, and the public; (8) has the ability to follow short, simple instructions, maintain attention, and do simple repetitive tasks; and (9) does not have the ability to withstand the stress of daily work activity, remember locations and procedures, remember and carry out detailed instructions, perform activities within a schedule, do an ordinary routine independently, make work-related decisions, seek assistance and ask questions, or accept instruction and criticism.  The individual cannot do complex tasks but can do simple, repetitive tasks.  She cannot do any work involving fiduciary or fiscal responsibility.  She must have low stress work with no high production quotas and no piece work.  She cannot do work involving the supervision of others and cannot be responsible for the health and safety of another.  She cannot do work involving arbitration, negotiation, or confrontations, and cannot interact at all with the public.  (Tr.  465-466).  The VE testified that such an individual would not be able to perform Blyler's past work or any other work on a full time basis. (Tr. 466).

The ALJ then asked the VE to consider a second hypothetical worker who: (1) has the ability to relate to peers, the public, and supervisors; (2) can understand and

9

follow short, simple directions; (3) can do repetitive tasks; (4) can withstand the stress of daily work activities and remember locations and procedures; (5) cannot remember or carry out detailed instructions; (6) can perform activities within a schedule, do an ordinary routine independently, work without distraction, and make work-related decisions; (7) is willing to ask questions and seek assistance, can accept instructions and criticism, can respond to work changes, can do simple repetitive tasks, including ones that require high productions quotas or piece work; (8) should not be involved in work involving the supervision of others or in work that involves arbitration, negotiation, or confrontation; and (9) should have minimal contact with the public. (Tr. 466-467).

The VE testified that such an individual would be able to perform Blyler's past factory work and probably her past work as a cashier, stock person, and deli clerk. The VE testified that assuming the ability to perform medium physical work there would be a number of jobs in the national economy for such an individual. (Tr. 467).

Blyler's counsel then asked the VE to consider an individual with the same limitations set forth in the ALJ's second hypothetical, who also has bladder control problems that requires her to use the bathroom five to 15 times a day. The VE testified that such an individual would not be able to work without accommodations. (Tr. 468).

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on March 15, 2003...through June 30, 2003, but not thereafter;

2. The claimant has not engaged in substantial gainful activity since March 15, 2003, the alleged onset date...;

3. The claimant has the following severe impairments: chronic substance addiction

11

disorder, primary alcohol; major depressive disorder or substance induced mood disorder; personality disorder; history of remote fractures of the fifth finger and distal radial metaphysis in 1999, and osteoarthritis of the hands and fingers; hypertension; mild obstructive ventilatory defect and asthma...;

4. The combination of claimant's chronic substance addiction disorder, primary alcohol, major depressive disorder or substance induced mood disorder and personality disorder medically equal Sections 12.04, 12.08 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1...;

5. If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments;

6. If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1...;

7. If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform at he exertional requirements of medium work.... From the nonexertional standpoint due to her mental impairments, if the claimant stopped substance use she would be unable to remember and carry out detailed instructions but would be able to perform activities within a schedule, do ordinary routine independently, would be able to make work-related decisions and work without distractions.  She would be willing to ask questions and seek assistance as well as able to do simple, routine tasks including ones that require high production quotas or piecework.  Although she should not be involved in work that requires supervision, responsibility for the health or safety of others, arbitration, negotiation or confrontation, she would be able to have minimal contact with the public under short duration and for a defined purpose;

8. If the claimant stopped the substance use, the claimant would be able to perform past relevant work as factory worker, cashier stock person and as a deli clerk.  This work does not require the performance of work-related activities precluded by her residual functional capacity if she stopped the substance use...;

9. Because the claimant would not be disabled if she stopped the substance use..., the claimant's substance use disorder is a contributing factor material to the determination of disability....  Thus, the claimant has not been disabled within the meaning of the Social "Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 17-18, 21, 23, 25, 27-28).

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. See *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

### A. The ALJ Properly Weighed the ME's Testimony

Blyler argues that the ALJ erred in rejecting the ME's testimony that Blyler's substance abuse is indivisible from her other mental impairments. Blyler's argument is without merit.

An individual is not considered disabled within the meaning of the Social Security Act if alcohol or drug addiction is a contributing factor material to the Commissioner's determination that the individual is disabled. 42 U.S.C. § 423(d)(2)(C). 20 C.F.R. § 416.935 provides in part:

> (b) (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled

> if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
> (3) If we find that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

It is the ALJ's duty to weigh the medical evidence in the record and to resolve any inconsistencies and conflicts among the medical evidence. 20 C.F.R. § 404.1527(c)(2). In this case, the ALJ rejected Dr. Spring's opinion that it is not possible to determine whether Blyler's condition would improve if she stopped drinking because Dr. Spring's opinion is contradicted by other evidence in the record, including comments made by individuals who had the opportunity to follow and treat Blyler in a clinical setting. Accordingly, the ALJ found that Dr. Spring's opinion on this specific issue had no probative weight. The ALJ's finding is supported by substantial evidence.

In reaching his decision, the ALJ properly compared the evidence of Blyler's impairments when she was abusing alcohol to the evidence of her impairments when she was not abusing alcohol. *See Bartley v. Barnhart*, 117 Fed. Appx. 993, 998 (6th Cir. 2004) (approving ALJ's comparison of claimant's impairments when sober and when not). Upon making this comparison, the ALJ concluded that while Blyler had severe mental impairments when she was drinking, her condition improved dramatically when she was not. Specifically, the ALJ noted that when Blyler was committed to Forum Health in April 2001, she had a blood alcohol level of .133 and an admitted history of alcohol abuse. At that time, she was assessed with a GAF score of 25. When Blyler

14

presented to Michele Bender at MetroHealth in January 2005, she reported drinking at least 40 ounces of beer prior to the visit. At that time, Bender noted that Blyler was unkempt, and her speech was mildly slurred. When Blyler presented to Bender on April 19, 2005, she reported that she does not intend to stop drinking and, that, "she does not believe alcohol hurts you any more than drinking Pepsi every day." (Tr. 314). At that time, Bender noted that Blyler was disheveled, underweight, and smelled of alcohol. She was disoriented as to time and place; her speech was slurred; and her thoughts were disorganized. Bender assigned Blyler a GAF score of 31. In September 2006, Blyler presented to Bender smelling of alcohol. Bender diagnosed Blyler with substance induced mood disorder and alcoholic hallucinations. She informed Blyler that the benefits of treatment were limited if she did not stop drinking. In October 2006, Bender renewed Blyler's September 2006 diagnosis and again advised Blyler that the benefits of treatment were limited unless she stopped drinking.

The ALJ also considered that Blyler was employed as a factory worker in February 2004, but reported that she left that job because of her drinking.

In contrast to the foregoing, the ALJ found that when Blyler stopped drinking, her symptoms improved. The ALJ's finding is based on two periods of sobriety: one when she was committed to Forum in 2001; and one when she was incarcerated in 2004. When Blyler was committed to Forum, her blood alcohol level was .133 and she was assigned a GAF score of 25. However, after only six days of treatment her GAF score improved to 80. Similarly, when Blyler was incarcerated, her functioning greatly improved. During a mental health examination, Department of Corrections psychiatrist Dr. Gemma noted that Blyler had adequate grooming and no motor abnormalities. Her

15

mood was euthymic and she presented with frequent smiling and laughter. She had no abnormalities concerning her speech or language, thought process, thought content and perception, or cognitive assessment. Blyler denied suicidal ideation or attempts, and she had adequate insight and judgment. Dr. Gemma noted that Blyler had been off her medication for two weeks, and she appeared absolutely normal and without objective evidence of anxiety or depression. Dr. Gemma assigned Blyler a GAF score of 70-80.

Based on the foregoing, the ALJ concluded that there is evidence of the independent impact of Blyler's chronic alcoholism. This finding is supported by substantial evidence. Accordingly, the ALJ did not err in rejecting Dr. Spring's opinion.

### B. The ALJ's Hypothetical Question To The VE Was Adequate

The ALJ presented two hypothetical question to the VE. The first question contained significant limitations on Blyler's ability to work; the second contained more moderate restrictions. The VE testified that an individual with the restrictions set forth in the first hypothetical would not be able to perform Blyler's past work, or any other work on a full time basis. However, an individual with the limitations set forth in the second hypothetical question would be able to perform Blyler's past work. The ALJ found that the second hypothetical accurately portrayed Blyler's limitations, and therefore concluded that Blyler is not disabled.

Blyler argues that the ALJ's second hypothetical question to the VE was inadequate in two respects. First, she asserts that the ALJ's hypothetical question was inadequate because it failed to include the more restrictive limitations set forth in the first hypothetical question. Second, she claims it was inadequate because it failed to include a limitation for five to 15 bathroom breaks a day due to Blyler's bladder control problems.

Each of these claims is without merit.

A VE's testimony must be based on a hypothetical question that accurately portrays the claimant's physical and mental impairments. *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). A hypothetical question need only include those impairments that were accepted by the ALJ and may excluded impairments that the ALJ reasonably discredited. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). If a VE testifies in response to a hypothetical question that precisely sets forth all the claimant's impairments, his response constitutes substantial evidence for a finding of either disability or nondisability. *Maziarz v. Secretary of Health and Human Servs.*, 837 F.2d 240, 247 (6th Cir. 1988).

Blyler alleges that the ALJ's second hypothetical question is inadequate because it does not include the more restrictive limitations set forth in his first hypothetical; however, Blyler offers no support for this argument other than her conclusory assertion. It is the claimant's burden to prove disability, and Blyler has failed to do so. 42 U.S.C.§ 423(d) (1) (A). Moreover, the limitations contained in the second hypothetical question are supported by substantial evidence. As discussed, the ALJ properly concluded that the impact of Blyler's alcoholism can be separated from the impact of her other mental impairments. Accordingly, the ALJ's hypothetical question need only include Blyler's limitations when she is not drinking. 20 C.F.R. § 416.935 The second hypothetical question accurately portrays these limitations.

When Blyler stopped drinking during her commitment to Forum Health, her GAF score went from 25 at the time of admission to 80 at the time of discharge. When Blyler stopped drinking due to incarceration, she was assessed with a GAF score of between

70 and 80.  A GAF score of 70-80 indicates only slight impairment in social, occupational, or school functioning.  During Blyler's incarceration, Dr. Gemma noted that Blyler appeared absolutely normal, and exhibited no signs of depression or anxiety despite being off her medication for two weeks.  Additionally, in 2004, Blyler was employed as a factory worker but quit due to her drinking.  Further, Blyler's mental residual functional capacity assessment, which was completed when Blyler admitted to drinking 80 ounces of beer daily, indicated that Blyler was, at most, moderately limited.  Accordingly, the ALJ's second hypothetical question accurately portrays Blyler's limitations when she is not drinking.

Blyler next argues that the ALJ should have included a limitation that requires five to 15 breaks due to Blyler's bladder control problem.  The ALJ considered whether Blyler had a urinary impairment that negatively impacted her ability to work, and concluded that she did not.  This finding is supported by substantial evidence.

The ALJ noted that Blyler presented evidence that she sought evaluation and treatment for complaints of urinary frequency and accidents, including a three day log of such events.  However, the ALJ further noted that Blyler had not presented evidence that she had undergone a cystoscopy, pyelogram, voiding cystogram, or other tests regarding the functioning of her urinary system.  Additionally, while Blyler had been prescribed Detrol, the ALJ note that she was also taking Maxzide, which is a combination of two diuretics.  Finally, he noted that her three day log indicated that many instances of frequency and accidents were associated with consumption of water or beer.  (Tr. 20).  Accordingly, the ALJ found that Blyler had not established that she had a urinary impairment that negatively impacted her ability to work.  Therefore, he  properly

excluded a limitation for five to 15 daily bathroom breaks from his hypothetical question.

### VII. Decision

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence. Accordingly, the decision of the Commissioner should be AFFIRMED.

s/*Nancy A. Vecchiarelli*
Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date: October 27, 2009

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**